In the Matter of HARRISON E. HOYT, an Attorney, Respondent.

First Department, June 15, 1917.

**Attorney at law disbarred.**

Attorney at law disbarred in that, after his election as director of a fraternal benefit association, he aided and abetted a conspiracy to loot the treasury of the association by appropriating securities, etc.

DISCIPLINARY PROCEEDINGS instituted by the Association of the Bar of the City of New York.

*Einar Chrystie* [*John Neville Boyle* of counsel], for the petitioner.

*Samuel H. Wandell,* for the respondent.

CLARKE, P. J.:

The facts about which there is no dispute have been substantially found by the learned official referee as follows:

The respondent was admitted to practice at the General Term of the Supreme Court, county of Monroe, in October, 1883, and was practicing in the First Judicial District at the time he committed the acts charged against him. He was also admitted to practice in the State of Colorado where he had lived for about twenty years. In 1910 he had become acquainted with one Eugene C. May and Joseph E. Blackburn, two general promoters, and all three had their offices in the same suite. He was told by May, in a general way, that May and Blackburn were arranging to get control of various fraternal organizations for the purpose of merging and rein-suring them; that they were thinking of taking up the Keystone

Guard of Pennsylvania and that in this connection respondent could be utilized. At Blackburn's request respondent examined the laws of Pennsylvania and rendered him a written opinion as to the control of the Insurance Commissioner over fraternal orders. At May's request he attended with May and Blackburn the biennial convention of the Keystone Guard at Denver, Colo., in June, 1910, and was present when the amendment to the constitution was passed authorizing the trustees to sell or exchange securities belonging to the organization upon the authority of the board of directors. While there respondent asked May what the plan was. May told him that it was a question of getting control of several fraternal orders for the purpose of turning them over to another company to get a commission of fifty per cent of the first year's premiums turned in; that the object of acquiring control was for the purpose of being able to deliver the Keystone Guard to the company in which it was to be reinsured and that it required five of the nine directors to acquire control; that the outgoing directors would have to be paid for their resignations and giving up lucrative positions; that the five to replace them would be respondent, Blackburn, May and two others and that the respondent would be required to act as a director in such a way as May and Blackburn could use him. Respondent inquired how he would be reimbursed, to which May said, " We will have to get this one first and then several others," and that when the time came respondent would be taken care of. A few days after Blackburn had returned from Denver he told respondent that he was arranging for a loan and asked respondent to meet Ridgway, the attorney for the party from whom Blackburn expected to get the loan. Blackburn requested respondent to take the written opinion about the Pennsylvania laws and a copy of the resolution passed at Denver and consult with Ridgway. Respondent met Ridgway to whom he furnished the papers requested by Blackburn. So far as respondent was concerned he understood that Blackburn was borrowing the money. Respondent was told by Ridgway that his man took a flyer once in a while.

The Keystone Guard had nine directors and three trustees. When the necessary resignations had been arranged respondent was elected a director and trustee. May was elected chairman

of the board of trustees and the third was a man named Gray. Blackburn, May and he were also elected directors as was also one Holland. Blackburn was also elected treasurer.

On June 27, 1910, the respondent and the two other trustees signed and delivered to Blackburn the following authorization:

"ATHENS, PENNA., *June* 27, 1910.

"MR. J. E. BLACKBURN:

"You are hereby authorized to sell or exchange any or all of the securities of the Keystone Guard now held by us as Trustees, and accounting to us therefor as such Trustees.

"EUGENE C. MAY, *Chairman,*

"HARRISON E. HOYT,

"J. F. GRAY."

Thereafter an important meeting took place at Athens, Penn., which was the home office of the Keystone Guard, a fraternal insurance company organized under the laws of Pennsylvania, on July 8, 1910, at a bank where the securities of the guard were kept. Among others, May, Blackburn and the respondent were present and also David S. Mills, president of the Audubon National Bank, and his attorney, Ridgway. Haverly, one of the outgoing directors and retiring treasurer, was also present. Stanton, one of the outgoing directors, had advised respondent that the three new trustees of whom respondent was one and May, chairman, had had their bonds accepted by a surety company and had qualified. Haverly brought the securities into the room from the safety deposit vault in two boxes which were placed in front of May who asked to have them checked. A printed list was produced and the securities were checked up with that list. May called off the securities to respondent who did the checking. On May's request respondent wrote out a list of the securities from what May read, of which respondent made a copy. Exhibits 5 and 6 are two sheets constituting the face and back, respectively, of a bill of sale, dated June 8, 1910, made by May and Hoyt, as trustees, witnessed by Ridgway, of securities in the schedule which appears at the back. The consideration recited is one dollar and other good and valuable considerations. The bill of sale runs to Black-

burn. The securities appear to be all of the securities mentioned in the report of the officers to the biennial convention held at Denver. Respondent executed this bill of sale after the securities were brought out. It was also executed and acknowledged by May at the same time. There was no consideration for the bill of sale. Receipts were given to the outgoing trustees for the securities. Then from the bulk of the securities covered by said bill of sale, $100,000, par value, of bonds were selected and offered to Mills. He and his attorney, Ridgway, examined them and they were pronounced by Mills to be all right. They were then delivered to Ridgway who gave a receipt for them as having been delivered to him by May and Hoyt. Mills thereupon produced $50,000 in money which he handed to Ridgway who gave it to Blackburn; the latter in turn gave it to Haverly, who was sitting in the same room, who thereupon proceeded to count it and then accepted it. In doing so Haverly announced that he had consulted an attorney with reference to the legality of his and his associates accepting $50,000 as compensation for giving up their offices, and that he had been told it was proper and legal, provided none of the money to be paid came out of the Keystone Guard assets, and he also inquired of Blackburn, May, Mills, Ridgway and the respondent whether any of the securities of the Keystone Guard had been pledged for the loan, to which all answered "no," except the respondent, who said, "not to my knowledge."

Thus it will be seen that at the time Haverly received the $50,000 he was no longer treasurer of the organization, and had resigned his other position, so that the payment of the $50,000 to Haverly for the benefit of the outgoing directors and the surrender of $100,000 securities to Mills were made after Blackburn and his associates were in control and had qualified. The respondent subsequently received from Blackburn, after consultation with May, the sum of $5,000 for his services generally in addition to his expenses. A month or two after July 8, 1910, Stanton came to respondent's office to see Blackburn; not finding him in, Stanton spoke to respondent asking in substance whether Blackburn was making arrangements to pay the other $50,000. Stanton told respondent that the arrangement was that Blackburn was to pay

$100,000, of which he had only paid $50,000 and had given his note for the other $50,000. Respondent called this conversation to Blackburn's attention when he came in, and Blackburn said, " that's all right, I am paying those fellows for giving up their positions."

This whole transaction turned out disastrously. Blackburn's reinsurance plan failed and a receiver was appointed for the Keystone Guard. An action was brought by said receiver against the Audubon National Bank to recover the value of the securities which had been wrongfully delivered to Mills by Blackburn. This action resulted in a judgment in favor of the plaintiff in the sum of $50,000, which, however, has not been collected as the Audubon National Bank went into liquidation.

The respondent seeks to meet the charge which characterizes the transactions participated in by him as described, as constituting professional misconduct, by claiming and testifying in substance that he was only a dummy trustee and director by the grace of May and Blackburn; that he had faith in them and acted for them as directed by them; that neither of them had informed him as to the real nature of the agreement with Mills, pursuant to which the $50,000 was paid and the securities of the Keystone Guard were pledged therefor, and that he acted throughout in complete ignorance thereof and in the belief that every thing was all right and legitimate.

The learned referee concludes as follows: " I fail to see that this claim and testimony can be held in view of all the facts and circumstances disclosed to amount to an exoneration of the respondent. He knew that May and Blackburn had agreed to pay the majority of the Board of Directors of the Keystone Guard for their resignations; he knew that they had no money; he knew that Blackburn had attempted to borrow money from a client of Ridgway, and in fact had assisted somewhat in procuring the loan by discussing the legal affairs of the Keystone Guard with Ridgway; he knew that at the time the securities were handed over to Mills the outgoing directors had resigned, but had not yet been paid for giving up what to them were lucrative positions; and he knew that he himself had qualified as director and trustee. As such director and trustee it was his duty to make

·full inquiries into the particulars of the transaction about to be consummated with Mills and to prevent its consummation if he should find that the proposition was to pledge the securities of the corporation to Mills in order to enable Blackburn to procure a loan with which to pay his personal obligation to persons who had resigned at his request. The discharge of this duty became all the more important when Haverly asked the question whether the securities of the corporation were to be pledged.

" The consummation of the transaction in the manner hereinbefore detailed should of itself have aroused the suspicion of the respondent as an experienced legal adviser. The conclusion is therefore unavoidable that the respondent, by omitting to make proper inquiry and participating in the carrying out of the scheme of Blackburn to the extent hereinbefore described, was guilty of conduct unbecoming an attorney and counsellor-at-law, even if he had no actual knowledge of the agreement between Blackburn and Mills and ·Ridgway to the effect that the securities were, to be pledged.

" It is true that some time thereafter the respondent assisted the receiver of the Keystone Guard, who brought several actions to recover for the conversion of the securities in question, by making a free statement of all he knew about the transactions; and it is also true that in the course of the trial of the indictment against Mills and others in the United States District Court, for the Southern District, the respondent was a witness for the prosecution, but these matters do not amount to exoneration, but only constitute mitigating circumstances."

It should also be stated that respondent has submitted a number of testimonials as to his character and has also voluntarily refrained entirely from the practice of the law since the filing of the complaint before the grievance committee of the Association of the Bar.

The general scheme of adroit and unscrupulous men who by their manipuations secure control of a financial institution and then make use of the securities of that institution to pay their personal obligations incurred in the process of acquiring control is unhappily a familiar incident in the recent financial history of this country. The wreck and ruin

following in the wake of such transactions is also too frequent to excite surprise. Respondent has been long at the bar and can plead neither youth nor professional inexperience. He was not the mere legal adviser of the master minds of this transaction, but became, upon his own confession, their pliant tool in putting it through, and he did this for a monetary consideration. He allowed himself to be elected a director of the corporation and one of the three trustees of its assets. Ignoring the fiduciary obligation personally assumed by him to the corporation, he did what he was bid to do by Blackburn and May. He thus aided and abetted in the most material way the carrying out of the conspiracy; he actually participated in the important details by which the treasury was looted. It is incredible that he did not understand fully what was transpiring in the directors' room of the bank at Athens, when he was examining and checking up the securities of the corporation, making lists and copies thereof, executing bills of sale and witnessing the transfer of a large block of said securities and the handing over to his office associates the money which he knew theretofore they had been attempting to borrow from Mills.

It is, of course, conceivable that he did not foresee the disaster which was to follow, and, conscience stricken, thereafter testified in the criminal and civil proceedings. Whether with full knowledge he took part in this scheme, or was so dense as not to appreciate what was going on under his very eyes, it is equally unsafe to allow him to continue to hold himself out as a member of the learned and honorable profession of the law.

Upon this record we are forced to approve the conclusion of the learned official referee and are of the opinion that the respondent should be and he hereby is disbarred.

SCOTT, SMITH, PAGE and DAVIS, JJ., concurred.

Respondent disbarred. Order to be settled on notice.